Amy A. Mousavi, Esq., SBN: 228388
MOUSAVI & LEE, LLP
4343 Von Karman Ave., Suite 250J
Newport Beach, CA 92660
Tel: (949) 864-9667
Email: amousavi@mousavilee.com

Attorneys for Defendant Craig Allen,
Cross-Complainant /Defendant
Deco Enterprises, Inc.

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA (LOS ANGELES DIVISION)**

| | |
|---|---|
| BENJAMIN POULADIAN<br><br>Plaintiff,<br>v.<br><br>DECO ENTERPRISES; CRAIG ALLEN; and DOES 1 through 10, inclusive,<br><br>Defendants. | **Case No.: 2:20-bk-11846-BB**<br>**Chapter 11**<br>**Adv. No. 2:20-ap-01126-BB**<br><br>**FOURTH AMENDED CROSS-COMPLAINT FOR:** |
| DECO ENTERPRISES, INC.; ABS CAPITOL, LLC; and BABAK SINAI, an individual;<br><br>Cross-Complainants;<br>v.<br><br>BENJAMIN POULADIAN; DELARA POULADIAN, TRUSTEE OF ABRAHAM AND DELARA POULADIAN FAMILY TRUST AMENDED AND RESTATED FEBRUARY 24, 2015; BENJAMIN POULADIAN, TRUSTEE OF ABRAHAM AND DELARA POULADIAN FAMILY TRUST AMENDED AND RESTATED FEBRUARY 24, 2015; DONNA AHDOOT, TRUSTEE OF ABRAHAM AND DELARA | **1. Breach of Fiduciary Duty;**<br>**2. Constructive Fraud;**<br>**3. Embezzlement/Conversion;**<br>**4. Breach of Contract;**<br>**5. Breach of Implied Covenant of Good Faith and Fair Dealing;**<br>**6. Fraud;**<br>**7. Abuse of Control and Corporate Waste;**<br>**8. Intentional Interference with Prospective Economic Advantage;**<br>**9. Indemnification**<br>**10. Disallowance of Claim No. 24; and**<br>**11. Disallowance of Claim No. 29.** |

POULADIAN FAMILY TRUST
AMENDED AND RESTATED
FEBRUARY 24, 2015;
and ROES 1 through 20,

Cross-Defendants.

## JURISDICTION AND VENUE

1. This Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§157(a) and 1334(b). This adversary proceeding arises in or is relates to the chapter 11 case, currently pending before the United States Bankruptcy Court for the Central District of California [Los Angeles Division] ("Bankruptcy Court"), entitled In re Deco Enterprises, Inc., Case No. 2:20-bk-11846-BB ("Bankruptcy Case").

2. Cross-Complainants consent to the entry of final orders or judgments by the Bankruptcy Court in this adversary proceeding.

3. Venue in the Bankruptcy Court is proper pursuant to 28 U.S.C. §1409 as this adversary proceeding arises in or relates to the Bankruptcy Case pending before the Los Angeles Division of the Central District.

## PARTIES AND GENERAL ALLEGATIONS

4. Cross-Complainant **Deco Enterprises, Inc**. (hereafter "**DECO**" or "CROSS-COMPLAINANT") is a California corporation doing business in Los Angeles, California. DECO is the chapter 11 debtor and debtor in possession

proceeding before the Bankruptcy Court, having filed a voluntary petition for reorganization on February 20, 2020.

5. Cross-Complainant **Babak Sinai**, also known as Bob Sinai (hereafter "**BOB SINAI**"), is an individual doing business in Los Angeles, California. BOB SINAI is a shareholder of DECO.

6. Cross-Complainant **ABS CAPITOL, LLC** (hereafter "**ABS**") is a limited liability company organized under the laws of the State of California.

7. Cross-Defendant **Benjamin Pouladian**, also known as Ben Petersen (hereafter "**POULADIAN**"), is an individual doing business in Los Angeles, California. At all times relevant, POULADIAN was both the President of DECO and a Director of DECO.

8. At all times relevant, POULADIAN had a fiduciary duty to DECO and all of DECO's shareholders.

9. Cross-Defendant **ABRAHAM AND DELARA POULADIAN FAMILY TRUST AMENDED AND RESTATED FEBRUARY 24, 2015** (hereafter the **"TRUST"**) is a revocable family TRUST.

10. Based on the **Certificate of Trust**, attached hereto as **Exhibit 1**, Cross-Defendant **Delara Pouladian** (hereafter **"DELARA"**) is one the trustees of the TRUST.

11. Based on the Certificate of Trust, attached hereto as Exhibit 1, Cross-Defendant **Donna Ahdoot** (hereafter "**AHDOOT**") is a co-trustee of the TRUST.

12. Based on the Certificate of Trust, attached hereto as Exhibit 1, Cross-Defendant Benjamin Pouladian is a co-trustee of the Trust. To distinguish Benjamin Pouladian, as a trustee, rather than individually, **Benjamin Pouladian in his capacity as co-trustee of TRUST**, will be referred to as **BENJAMIN TRUSTEE**.

13. Cross-Complainants are unaware of the true names and capacities, whether individual, corporate, partnership, associate, or otherwise, of Cross-Defendants ROES 1 through 20, inclusive, and therefore, sues these Cross-Defendants by such fictitious names. Cross-Complainants are informed and believe, and on that basis allege that each of the Cross-Defendants designated as a Roe is legally responsible and liable in some manner for the events and happenings herein referred to, and when the true names and capacities of each such Roe is discovered, Cross-Complainants will seek leave to amend this Cross-Complaint by the insertion of each such name and capacity, and if necessary, apt and proper words to charge each.

14. Cross-Complainants are informed and believe, and on that basis allege that at all relevant times herein mentioned, each of the Cross-Defendants was the agent, servant, and employee of each of the other Cross-Defendants and in connection with the acts hereinafter alleged, was acting within the scope of such agency and employment, and each Cross-Defendant ratified each and every act, omission, and thing done by every other Cross-Defendant named herein.

//

**<u>FIRST CAUSE OF ACTION</u>**

**BREACH OF FIDUCIARY DUTY**

**(By DECO against POULADIAN and ROES 1-20)**

15. Cross-Complainants incorporate by reference, as though set forth in full herein, paragraphs 1 through 14, inclusive.

16. In or about March 2005 DECO was registered as a California corporation with the Secretary of State of California.

17. DECO's shareholders consisted of three brothers, BOB SINAI, Saman Sinai, Siamak Sinai, and their cousin, POULADIAN.

18. At all times relevant, POULADIAN was not only a trusted family member, but also the President and a Director of DECO.

19. DECO was a successful company and would have continued to be successful, but for POULADIAN's actions, as set forth in this Third Amended Cross-Complaint.

20. In or about October 1, 2013, DECO and its shareholders entered into a **Shareholder and Buy-Sell Agreement** (hereafter "Shareholder Agreement"). A true and correct copy of said Shareholder Agreement is attached hereto as **Exhibit "2**."

21. Section 12.1 of the Shareholder Agreement requires the Board of Directors to meet, three months after the full execution of the Shareholder

Agreement, and once a year thereafter, to determine the salaries of the officers of DECO.

22. Section 12.3 of the Shareholder Agreement requires the vote of all of the shareholders of DECO for certain actions, including but not limited to Amendment of the Articles of DECO, and incurring debts or liabilities in the aggregate amount of $50,000, annually.

23. In or about August of 2019, POULADIAN called all of the shareholders for a meeting. DECO's employee and Chief Financial Officer, Craig Allen, who has been named as a Defendant in this action, was also present during the meeting.

24. During that meeting, POULADIAN, for the first time, informed all of the shareholders and Craig Allen that POULADIAN had forged BOB SINAI's signature to incur millions of dollars in loans. POULADIAN also admitted that, through his fraudulent conduct, he had encumbered the real property owned by ABS as collateral for the DECO loans that POULADIAN had fraudulently obtained, despite the fact that POULADIAN was a fiduciary of DECO, since he was the President and a Director of DECO.

25. Prior to meeting with everyone, POULADIAN told Craig Allen that if the other shareholders want to pursue him, POULADIAN held the upper hand with what he referred to as the "Silver Bullet." POULADIAN explained that since the TRUST (POULADIAN's Parents' trust) is a member of ABS Capitol, LLC and a

shareholder of Capital Lighting & Electric Supply of South Bay, Inc. (hereafter "CAPITAL"), POULADIAN would file lawsuits using the TRUST. POULADIAN later confirmed that his intent was to ensure the demise of DECO and to use what he referred to as his substantial wealth and deep pockets to keep suing DECO, BOB SINAI and SIAMAK Sinai, and thereby drown DECO and its shareholders in legal fees.

26. BOB SINAI, Siamak Sinai, POULADIAN, and the TRUST own the following percentages in the three entities:

| Party: | ABS | DECO | CAPITAL |
|---|---|---|---|
| Def. Babak Sinai | 25% | 20% | 25% |
| Def. Siamak Sinai | 50% | 20% | 50% |
| Trust | 25% | 0% | 25% |
| Benjamin Pouladian | 0% | 30% | 0% |

27. After the meeting in August 2019, POULADIAN put on the appearance of being very apologetic and told all present that he would forfeit his ownership shares in DECO to compensate for his misconduct. In response to a text message from BOB SINAI, on August 14, 2019, POULADIAN wrote "**Ok. I give up my shares already I am out.**"

28. POULADIAN then resigned his positions as an officer and director of DECO.

29. POULADIAN then stayed away until three months later, in November

of 2019, when he heard that there was a term sheet for an investor. POULADIAN then sent an e-mail stating that he was withdrawing his offer to surrender his shares.

30. Meanwhile, POULADIAN had damaged DECO so severely that DECO had to file for bankruptcy relief under Chapter 11.

31. Consistent with his threat to tie up everyone in litigation, POULADIAN, who is a trust fund baby, with the TRUST having about $200,000,000.00 in assets, started to execute on his promise by filing lawsuits, first against DECO and Craig Allen, then on behalf of the TRUST, he filed a lawsuit against ABS, and finally, he filed an action against CAPITAL.

32. Prior to filing the lawsuit against DECO, POULADIAN, with malice in bad faith, send an unfiled copy of the Complaint against DECO and Craig Allen to Siena Lending Group, LLC ("SIENA"), in fulfilment of prior threats to discredit Craig Allen and interfere with DECO's attempts to secure capital, and, to encourage SIENA to foreclose on its loan to DECO, and the Vail Avenue Property, which is owned by ABS, and the property that POULADIAN had fraudulently pledged as a security for that loan. POULADIAN forged BOB SINAI'S signature to obtain the additional funding of over $2,000,000 from SIENA against which the real property of ABS located at 2971 S. Vail Ave, in Commerce, CA ("**Vail Avenue Property**") was specifically pledged as security.

33. Also in follow through of his threat, POULADIAN used The TRUST to file a Lis Pendens on the **Vail Avenue Property** that POULADIAN had pledged

as security for the loan from SIENA to DECO. The TRUST also recorded a Lis Pendens on another property of ABS located at 15826 Hawthorne Blvd, Lawndale, California.

34. The notices of Lis Pendens were recorded in bad faith and with malice, so that ABS would not be able to refinance the loan from SIENA, and to make sure DECO cannot successfully reorganize.

35. At all times relevant prior to his resignation, as an officer and director of DECO, POULADIAN owed DECO and DECO's shareholders a fiduciary duty.

36. "A fiduciary relationship is 'any relation existing between parties to a transaction wherein one of the parties is . . . duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent.'" (*Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 29 [130Cal.Rptr.2d 860].)

37. Beginning in August 2019, and continuing on, DECO and its shareholders have discovered that POULADIAN had breached his fiduciary duties by *inter alia*:

- Misrepresentation to DECO's shareholders concerning the initial loan amount from SIENA to be $25,000 and presentation of partial and incomplete

documents to shareholders to fraudulently obtain their consent;

- Forging BOB SINAI's signature to obtain millions of dollars in loans without the required approval of all of the shareholders;

- Forging BOB SINAI's signature to pledge the Vail Avenue Property for additional funding of over two million dollars, for DECO, so that POULADIAN could continue to enjoy his lavish life, including the salary that POULADIAN had set for himself without the approval of the Board of Directors of DECO;

- Increasing his own salary from $145,000 on January 10, 2014 to $338,000 by May of 2016, and continuing on until the date of his resignation on August 19, 2019, resulting in excess and unauthorized salary related costs of $1,177, 350.65, which was used to purchase a house with his wife, Edith Pouladian, in the amount of 5,000,000.00;

- Using DECO's credit cards, without authorization and approval, to pay for his personal expenses in the amount of $150,000, and in 2018 alone, while DECO was financially suffering as a result of POULADIAN's mismanagement, POULADIAN used DECO's credit cards to pay for his personal expenses in the amount of $68,811;

- Purporting to amend the Articles of Incorporation without the required approval and vote of the shareholders, to attempt to create protection for his own misconduct that was known to him, only;

- Embezzling and converting Two Hundred Eighty Thousand Dollars

($280,000) prior to 2015, and approximately Four Hundred Thousand Dollars ($400,000.00) of DECO's assets between 2015-2019, by cashing out the value of the credit card rewards points on DECO's credit cards, for his personal use, including, based on information and belief, purchasing a house with his wife, in the amount of $5,000,000.00;

- informing Craig Allen, Chief Financial Officer of the company that POULADIAN wants to write two $50,000 checks to himself, so that in purchasing his house and obtaining a loan from the lender, POULADIAN could misrepresent his income to his lender. Mr. Allen objected and threatened to walk out;

- Committing insurance fraud by intentionally misclassifying employees to DECO's insurance company and subjecting DECO to a risk of insurance fraud causing harm to Deco that had to pay $130,000;

- POULADIAN instructed and forced employees to tamper with documents, resulting in complaints to Human Resources;

- POULADIAN forged the signature of the Accounts Payable Manager of DECO;

- Misrepresentation to a DECO customer, resulting in discontinuation of over Two Million ($2,000,000) purchases from the company annually;

- Shortly prior to his forfeiture of shares and resignation, POULADIAN purported to amend the buy-sell agreement, to value the company, which he knew was insolvent, at $100,000,000, for the purpose of obtaining life insurance (another

example of his intent to defraud an insurance company), as well as purporting to amend the definition of disability in the Shareholder Agreement, so that Pouladian could get disability insurance and then fraudulently claim disability, defrauding the insurance company;

- Unprofessional conduct towards employees, resulting in a lawsuit by an employee and payment of $50,000 as a portion of the Settlement;

- Unauthorized hiring an employee under a long-term employment agreement, causing Deco to incur liability of $150,000 without the required approval of the shareholders, resulting in actions taken by that employee and resulting $300,000 damages to Deco;

- Signing agreements without first obtaining the required vote of the shareholders, ultimately resulting in a Stipulation for Judgment in the amount of Five Million Dollars;

- POULADIAN's intentional disregard of Philips Lighting Holding's demands for rightful payment, resulting in a lawsuit and loss of over $450,000;

- mismanaging DECO and ordering Millions of Dollars of excess inventory without the required approval of the shareholders;

- Encumbering DECO with debt without authorization and/or the required vote of the shareholders;

- Misrepresentation of DECO's financials to the secured lender, City National Bank, resulting in recall of the loan, forcing DECO to obtain loan from a non-bank

Lender, causing DECO to pay an additional $1.2 Million Dollars in interest, due to POULADIAN'S fraudulent representation to a financial institution; and

- Falsely accusing his direct subordinate Craig Allen of increasing his own salary and threatening to file this lawsuit to damage his reputation and career, and to tie Mr. Allen up with years of litigation. Having gone public as promised with his malicious claims, Mr. Allen has been damaged in an amount according to proof at trial.

38. As a direct and proximate result of the fraud, breach of fiduciary duties by POULADIAN, both DECO and SINAI have been damaged in an amount according to proof at trial, but which includes, at the minimum:

a) At least $50,000,000 in damages to DECO and the shareholders of DECO, in that it appears that as a result of the POULADIAN's conduct and breaches, DECO lost its customers, suppliers, operating funds and financing, to the point that DECO may not survive, resulting in the loss of the market value of the company, which was at least $50,000,000;

b) Damages to Sinai of at least $5,000,000.

39. By engaging in the aforementioned conduct, POULADIAN is guilty of oppression, fraud and malice, and has acted with an intent to vex, harass, injure and annoy DECO, BOB SINAI, and other shareholders of DECO, with a conscious disregard for their rights, and by reason thereof should pay DECO punitive damages in an amount to be determined at trial.

//

*Prayer for Relief-First Cause of Action*

Wherefore, Cross-Complainant respectfully requests that this Honorable Court award Cross-Complainant judgment in its favor and against Cross-Defendants for 1) general and compensatory damages in the amount of $55,000,000, but according to proof at trial; 2) Prejudgment interest; 3) Special and consequential damages; 4) Punitive damages; 5) Costs and attorneys' fees incurred in this action; and 6) Any other and further relief the court considers proper.

**<u>SECOND CAUSE OF ACTION</u>**

**CONSTRUCTIVE FRAUD**

**(By DECO against POULADIAN and ROES 1-20)**

40. Cross-Complainants incorporate by reference, as though set forth in full herein, paragraphs 1 through 39, inclusive.

41. In or about March 2005, DECO was registered as a California corporation with the Secretary of State of California.

42. DECO's shareholders consisted of three brothers, BOB SINAI, Saman Sinai, Siamak Sinai, and their cousin, POULADIAN.

43. At all times relevant, POULADIAN was not only a trusted family member, but also the President and Director of DECO. At all times relevant, as an officer and director of DECO, POULADIAN owed DECO and its shareholders a fiduciary duty.

44. In or about October 1, 2013, DECO and its shareholders entered into a Shareholder Agreement. A true and correct copy of the said Shareholder Agreement is attached hereto as Exhibit "**2**."

45. Section 12.3 of the Shareholder Agreement requires the vote of all of the shareholders of DECO for certain actions, including but not limited to Amendment of the Articles of DECO and incurring debts or liabilities in the aggregate amount of $50,000, annually.

46. In or about August of 2019, POULADIAN called all of the shareholders for a meeting. DECO's employee and Chief Financial Officer, Craig Allen, who has been named as a Defendant in this action, was also present during the meeting.

47. During that meeting, POULADIAN, for the first time, informed all of the shareholders and Craig Allen that POULADIAN had forged BOB SINAI's signature to incur millions of dollars in loans from the said lender. POULADIAN also admitted that through his fraudulent conduct, he had put up the real property owned by ABS as collateral for the DECO loans that POULADIAN had obtained fraudulently, despite the fact that POULADIAN was a fiduciary of DECO since he was the President (an officer) and a Director.

48. Prior to August of 2019, POULADIAN had concealed from DECO and its shareholders that he had forged BOB SINAI's signatures on documents and had obtained millions of dollars in loans without obtaining approval of all of the

shareholders.

49. In obtaining the loan from SIENA initially, POULADIAN had told DECO's shareholders that the loan was for $25,000. Additionally, prior to August of 2019, POULADIAN had concealed from DECO and its shareholders the fact that he had forged BOB SINAI's signatures on documents and had obtained millions of dollars in loans without obtaining approval of all of the shareholders. Now, Cross-Complainants know that POULADIAN had forged the signature of DECO's Accounts Payable Manager, as well.

50. During the meeting POULADIAN put on the appearance of being very apologetic and told all present that he will forfeit his shares in DECO. In response to a text message from BOB SINAI, on August 14, 2019, POULADIAN wrote to BOB SINAI "Ok. I give up my shares already I am out."

51. POULADIAN followed up with resigning his positions as an officer and director of DECO.

52. In the August 2019 meeting, POULADIAN admitted for the first time that unbeknownst to DECO, BOB SINAI and Siamak Sinai, between 2015 and 2019, POULADIAN had converted approximately $400,000 of DECO's assets by cashing out credit card points that DECO had accumulated over the years, including the points on the American Express credit card for his personal use. Later, in 2019, Cross-Complainants also learned that prior to 2015, POULADIAN had converted DECO's credit card reward points in the amount of approximately

$280,000 for his own benefit, including investments and purchase of the Carmelina Property.

53. POULADIAN also admitted to raising his salary without the Board's authorization and in breach of the Shareholder and Buy-Sell Agreement, resulting in POULADIAN receiving close to $1,200,000 in excess salary and benefits, which POULADIAN used to purchase his second house located at 205 S Carmelina Ave, Los Angeles, CA 90049 (hereafter "Carmelina Property," for over Five Million Dollars.

54. POULADIAN used the funds he converted from DECO's credit cards to purchase the Carmelina Property, in July of 2018, with his wife EDITH POULADIAN.

55. DECO has since discovered that, unbeknownst to DECO and its shareholders, in 2016, POULADIAN had amended the Articles of Incorporation of DECO without the required vote of all DECO's shareholders.

56. DECO'S shareholders were justified in their reliance on POULADIAN, since he was their cousin, the President and a member of the Board of Directors of DECO.

57. By committing the acts alleged above, POULADIAN has breached his fiduciary duty to DECO and its shareholders, and has committed fraud, for his own personal gain and his advantage, to the detriment of DECO and its shareholders.

58. As a direct and proximate result of the fraud, breach of fiduciary duties

by POULADIAN, DECO has been damaged in an amount according to proof at trial, but which includes, at the minimum:

a) At least $50,000,000 in damages to DECO and the shareholders of DECO, in that it appears that as a result of the POULADIAN's conduct and breaches, DECO lost its customers, suppliers, operating funds and financing, to the point that DECO may not survive, resulting in the loss of the market value of the company, which was at least $50,000,000;

59. By engaging in the aforementioned conduct, POULADIAN is guilty of oppression, fraud and malice, and has acted with an intent to vex, harass, injure and annoy DECO, BOB SINAI and other shareholders, with a conscious disregard for their rights, and by reason thereof should pay DECO punitive damages in an amount to be determined at trial.

60. DECO is entitled to an Order by the Court for the imposition of a Constructive Trust, by which Cross-Defendant POULADIAN holds the Carmelina Property in trust, for Cross-Complainants DECO and BOB SINAI.

61. DECO is entitled to an Order by the Court for the imposition of a Constructive Trust, by which Cross-Defendant POULADIAN holds any and all investments in any property obtained by his ill-gotten gains from DECO.

*Prayer for Relief-Second Cause of Action*

Wherefore, Cross-Complainant respectfully requests that this Honorable Court award Cross-Complainants judgment in their favor and against Cross-

Defendants for 1) general and compensatory damages in the amount of $55,000,000, but according to proof at trial; 2) Prejudgment interest; 3) Special and consequential damages; 4) Punitive damages; 5) Costs and attorneys' fees incurred in this action; 6) For imposition of a constructive trust on the Carmelina Property, and all investments in any property obtained by ill-gotten gains from DECO, for the benefit of DECO; and 7) Any other and further relief the court considers proper.

## THIRD CAUSE OF ACTION

## EMBEZZLEMENT/CONVERSION

## (By DECO against POULADIAN and ROES 1-20)

62. Cross-Complainants incorporate by reference, as though set forth in full herein, paragraphs 1 through 61, inclusive.

63. At all times relevant, DECO was the rightful owner of all of its property, including the credit cards, benefits of its credit cards, and all of its revenue.

64. In or about August of 2019, Cross-Complainants discovered that POULADIAN had intentionally interfered with their rights by committing the acts described, below.

65. In or about August 2019, POULADIAN admitted that without DECO's authorization and knowledge, POULADIAN had cashed the rewards points for DECO's business credit card, for which DECO had paid all along, in an amount of approximately $400,000.00

66. In or about August 2019, Cross-Complainants discovered that POULADIAN, without DECO's authorization or consent used DECO's credit cards in the amount of $150,000 to pay for his personal expenses, and ***in 2018 alone***, while DECO was financially suffering as a result of POULADIAN's mismanagement, POULADIAN used DECO's credit cards to pay for his ***personal expenses in the amount of $68,811***.

67. As a direct and proximate result of the fraud, breach of fiduciary duties by POULADIAN, DECO has been damaged in an amount according to proof at trial, but which includes, at least $50,000,000 in damages to DECO and the shareholders of DECO, in that it appears that as a result of the POULADIAN's conduct and breaches, DECO lost its customers, suppliers, operating funds and financing, to the point that DECO may not survive, resulting in the loss of the market value of the company, which was at least $50,000,000;

68. DECO is entitled to an Order by the Court for the imposition of a Constructive Trust, by which Cross-Defendant POULADIAN holds the Carmelina Property in trust, for Cross-Complainant DECO.

69. DECO is entitled to an Order by the Court for the imposition of a Constructive Trust, by which Cross-Defendant POULADIAN holds any and all investments in any property obtained by his ill-gotten gains from DECO.

*Prayer for Relief-Third Cause of Action*

Wherefore, Cross-Complainants respectfully requests that this Honorable

Court award Cross-Complainants judgment in their favor and against Cross-Defendants for 1) general and compensatory damages in the amount of $50,000,000, but according to proof at trial; 2) Prejudgment interest; 3) Special and consequential damages; 4) Punitive damages; 5) Costs and attorneys' fees incurred in this action; 6) For imposition of a constructive trust on the Carmelina Property and all investments in any property obtained by POULADIAN's ill-gotten gains from Deco, for the benefit of DECO and BOB Sinai; and 7) Any other and further relief the court considers proper.

## FOURTH CAUSE OF ACTION

## BREACH OF CONTRACT

## (By DECO against POULADIAN and ROES 1-20)

70. Cross-Complainants incorporate by reference, as though set forth in full herein, paragraphs 1 through 69, inclusive.

71. In or about October 2013, DECO and its shareholders entered into the Shareholder Agreement.

72. Section 12.3 of the Shareholder Agreement requires the vote of all of the shareholders of DECO for certain actions, including but not limited to Amendment of the Articles of DECO and incurring debts or liabilities in the aggregate amount of $50,000, annually.

73. POULADIAN has breached the Shareholder Agreement by, inter alia:

- informing Craig Allen, Chief Financial Officer of the company that

POULADIAN wants to write two $50,000 checks to himself, so that in purchasing his house and obtaining a loan from the lender, POULADIAN could misrepresent his income to his lender. Mr. Allen objected and threatened to walk out;

- committing insurance fraud by intentionally misclassifying employees to DECO's insurance company and subjecting DECO to a risk of insurance fraud causing harm to Deco that had to pay $130,000;

- forging and instructing employees to tamper with documents, resulting in complaints to Human Resources;

- forging the signature of the Accounts Payable Manager of DECO;

- making misrepresentation to a DECO customer, resulting in discontinuation of over Two Million ($2,000,000) purchases from the company annually;

- purporting to amend the buy-sell agreement shortly before his forfeiture of shares and resignation, to value DECO at $100,000,000.00, despite POULADIAN's knowledge that DECO was insolvent, so that POULADIAN could obtain life insurance (another example of his intent to defraud an insurance company), as well as purporting to amend the definition of disability in the Shareholder Agreement, so that Pouladian could get disability insurance and then fraudulently claim disability, defrauding the insurance companies;

- engaging in unprofessional conduct towards employees, resulting in a lawsuit by an employee and payment of $50,000 as a portion of the Settlement;

- engaging in the unauthorized hiring of an employee under a long-term

employment agreement, causing Deco to incur liability of $150,000 without the required approval of the shareholders, resulting in actions taken by that employee and resulting $300,000 damages to Deco;

- signing agreements without first obtaining the required vote of the shareholders, ultimately resulting in a Stipulation for Judgment in the amount of Five Million Dollars;

- intentional disregard of Philips Lighting Holding's demands for rightful payment, resulting in a lawsuit and loss of over $450,000;

- mismanaging DECO and ordering Millions of Dollars of excess inventory without the required approval of the shareholders;

- encumbering DECO with debt without authorization and/or the required vote of the shareholders;

- misrepresenting DECO's financials to the secured lender, City National Bank, resulting in recall of the loan, forcing DECO to obtain loan from a non-bank Lender, causing DECO to pay an additional $1.2 Million Dollars in interest, due to POULADIAN'S fraudulent representation to a financial institution; and

- falsely accusing his direct subordinate Craig Allen of increasing his own salary and threatening to file this lawsuit to damage his reputation and career, and to tie Mr. Allen up with years of litigation. Having gone public as promised with his malicious claims, Mr. Allen has been damaged in an amount according to proof at trial.

74. As a direct and proximate result of the fraud, breach of fiduciary duties by POULADIAN, DECO has been damaged in an amount according to proof at trial, but which includes, at least $50,000,000 in damages to DECO and the shareholders of DECO, in that it appears that as a result of the POULADIAN's conduct and breaches, DECO lost its customers, suppliers, operating funds and financing, to the point that DECO may not survive, resulting in the loss of the market value of the company, which was at least $50,000,000;

*Prayer for Relief-Fourth Cause of Action*

Wherefore, Cross-Complainants respectfully requests that this Honorable Court award Cross-Complainants judgment in their favor and against Cross-Defendants for 1) general and compensatory damages in the amount of $50,000,000, but according to proof at trial; 2) Prejudgment interest; 3) Special and consequential damages; 5) Costs and attorneys' fees incurred in this action; and 6) Any other and further relief the court considers proper.

## <u>FIFTH CAUSE OF ACTION</u>

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**(By DECO against POULADIAN and ROES 1-20)**

75. Cross-Complainants incorporate by reference, as though set forth in full herein, paragraphs 1 through 74, inclusive.

76. In or about October 2013, DECO and its shareholders entered into the

Shareholder Agreement.

77. It is undisputed that in every contract, there is an implied covenant of good faith and fair dealing. The covenant imposes on each party a duty to refrain from doing anything which would render performance of the contract impossible.

78. The covenant also imposes a duty on every party to the contract to do everything that a contract presupposes each party will do to accomplish its purpose.

79. POULADIAN has breached the implied covenant of good faith and fair dealing by, inter alia:

- informing Craig Allen, Chief Financial Officer of the company that POULADIAN wants to write two $50,000 checks to himself, so that in purchasing his house and obtaining a loan from the lender, POULADIAN could misrepresent his income to his lender. Mr. Allen objected and threatened to walk out;
- committing insurance fraud by intentionally misclassifying employees to DECO's insurance company and subjecting DECO to a risk of insurance fraud causing harm to Deco that had to pay $130,000;
- forging and instructing employees to tamper with documents, resulting in complaints to Human Resources;
- forging the signature of the Accounts Payable Manager of DECO;
- making misrepresentation to a DECO customer, resulting in discontinuation of over Two Million ($2,000,000) purchases from the company annually;
- purporting to amend the buy-sell agreement shortly before his forfeiture of

shares and resignation, to value DECO at $100,000,000.00, despite POULADIAN's knowledge that DECO was insolvent, so that POULADIAN could obtain life insurance (another example of his intent to defraud an insurance company), as well as purporting to amend the definition of disability in the Shareholder Agreement, so that Pouladian could get disability insurance and then fraudulently claim disability, defrauding the insurance companies;

- engaging in unprofessional conduct towards employees, resulting in a lawsuit by an employee and payment of $50,000 as a portion of the Settlement;

- engaging in the unauthorized hiring of an employee under a long-term employment agreement, causing Deco to incur liability of $150,000 without the required approval of the shareholders, resulting in actions taken by that employee and resulting $300,000 damages to Deco;

- signing agreements without first obtaining the required vote of the shareholders, ultimately resulting in a Stipulation for Judgment in the amount of Five Million Dollars;

- intentional disregard of Philips Lighting Holding's demands for rightful payment, resulting in a lawsuit and loss of over $450,000;

- mismanaging DECO and ordering Millions of Dollars of excess inventory without the required approval of the shareholders;

- encumbering DECO with debt without authorization and/or the required vote of the shareholders;

- misrepresenting DECO's financials to the secured lender, City National Bank, resulting in recall of the loan, forcing DECO to obtain loan from a non-bank Lender, causing DECO to pay an additional $1.2 Million Dollars in interest, due to POULADIAN's fraudulent representation to a financial institution; and

- falsely accusing his direct subordinate Craig Allen of increasing his own salary and threatening to file this lawsuit to damage his reputation and career, and to tie Mr. Allen up with years of litigation. Having gone public as promised with his malicious claims, Mr. Allen has been damaged in an amount according to proof at trial.

80. As a direct and proximate result of the fraud, breach of fiduciary duties by POULADIAN, DECO has been damaged in an amount according to proof at trial, but which includes, at least $50,000,000 in damages to DECO and the shareholders of DECO, in that it appears that as a result of the POULADIAN's conduct and breaches, DECO lost its customers, suppliers, operating funds and financing, to the point that DECO may not survive, resulting in the loss of the market value of the company, which was at least $50,000,000

*Prayer for Relief-Fifth Cause of Action*

Wherefore, Cross-Complainants respectfully requests that this Honorable Court award Cross-Complainants judgment in their favor and against Cross-Defendants for 1) general and compensatory damages in the amount of $50,000,000, but according to proof at trial; 2) Prejudgment interest; 3) Special and

consequential damages; 4) Punitive damages; 5) Costs and attorneys' fees incurred in this action; and 6) Any other and further relief the court considers proper.

**SIXTH CAUSE OF ACTION**

**FRAUD**

**(By ABS and BOB SINAI against POULADIAN and ROES 1-20)**

81. Cross-Complainants incorporate by reference, as though set forth in full herein, paragraphs 1 through 80, inclusive.

82. ABS is the owner of the Vail Avenue Property, the real property on which DECO does business.

83. Siamak Sinai is both a shareholder of DECO and 50% owner of ABS. The other half is owned 25% by BOB SINAI and 25% by the TRUST.

84. In or about August 2019, CROSS-COMPLAINANTS discovered that POULADIAN had encumbered the property of ABS by millions of dollars, by presenting false documents to members of ABS, and by forging BOB SINAI's signature.

85. POULADIAN misrepresented facts, including the initial loan documents and the amount of the loan with the intent to induce reliance. POULADIAN then fraudulently presented partial and incomplete documents, to induce BOB SINAI and Siamak Sinai, for the purpose of putting up ABS' property as a collateral for the unauthorized debts of DECO.

86. This was a material fact and had Siamak Sinai and BOB SINAI known

about it, they would have never signed the document/s that was presented to them.

87. ABS justifiably relied on the concealment and misrepresentations of POULADIAN, especially in light of the fact that POULADIAN was the Sinai brothers' cousin.

88. ABS and BOB SINAI relied on POULADIAN's representations to their detriment.

89. As a direct and proximate result of the fraud, breach of fiduciary duties by POULADIAN, DECO, SINAI and ABS have been damaged in an amount according to proof at trial, but which includes, at the minimum:

a) At least $50,000,000 in damages to DECO and the shareholders of DECO, in that it appears that as a result of the POULADIAN's conduct and breaches, DECO lost its customers, suppliers, operating funds and financing, to the point that DECO may not survive, resulting in the loss of the market value of the company, which was at least $50,000,000;

b) Damages to Sinai of at least $5,000,000; and

c) Damages to ABS in the approximate amount of $2,000,000.

90. By engaging in the aforementioned conduct, POULADIAN is guilty of oppression, fraud and malice, and has acted with an intent to vex, harass, injure and annoy ABS and its members, with a conscious disregard for their rights, and by reason thereof should pay ABS punitive damages in an amount to be determined at trial.

*Prayer for Relief-Sixth Cause of Action*

Wherefore, Cross-Complainants respectfully requests that this Honorable Court award Cross-Complainants judgment in their favor and against Cross-Defendants for 1) general and compensatory damages in the amount of $57,000,000, but according to proof at trial; 2) Prejudgment interest; 3) Special and consequential damages; 4) Punitive damages; 5) Costs and attorneys' fees incurred in this action; and 6) Any other and further relief the court considers proper.

## SEVENTH CAUSE OF ACTION

## ABUSE OF CONTROL AND CORPORATE WASTE

**(By DECO against POULADIAN and ROES 1-20)**

91. Cross-Complainants incorporates by reference, as though set forth in full herein, paragraphs 1 through 90, inclusive.

92. By virtue of his position as DECO's President and Director, as well as a trusted family member, POULADIAN exercised control over DECO and its operations, and owed duties as a controlling person to DECO not to use his positions of control for his own personal interests, contrary to the interest of DECO.

93. POULADIAN's conduct amounts to an abuse of his control of DECO, in violation of POULADIAN's obligations to DECO.

94. As a result of POULADIAN's abuse of control, DECO has sustained and will continue to sustain damages of at least $50,000,000 and injuries for which it has no adequate remedy at law.

*Prayer for Relief-Seventh Cause of Action*

Wherefore, Cross-Complainants respectfully requests that this Honorable Court award Cross-Complainants judgment in their favor and against Cross-Defendants for 1) general and compensatory damages in the amount of $50,000,000, but according to proof at trial; 2) Prejudgment interest; 3) Special and consequential damages; 4) Punitive damages; 5) Costs and attorneys' fees incurred in this action; and 6) Any other and further relief the court considers proper.

**EIGHTH CAUSE OF ACTION**

**INTENTINAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

**(By DECO against DELARA, AHDOOT, and BENJAMIN TRUSTEE, and ROES 1-20)**

95. Cross-Complainants incorporate by reference, as though set forth in full herein, paragraphs 1 through 94, inclusive.

96. Based on information and belief, at all times relevant, DELARA, DONNA, and POULADIAN were the trustees of the Trust.

97. DECO who had filed for Reorganization was in an economic relationship with certain lenders, including Olympia Financial, Private Mortgage Fund, LLC, and Eastborne Investment, LLC, to refinance its unfavorable loan that was fraudulently obtained by POULADIAN.

98. The Trust knew or should have known that DECO needed the

refinance to successfully reorganize and to obtain a better loan.

99. The TRUST however, intentionally and without any justification or privilege, filed two Lis Pendences on the properties of ABS, to interfere with DECO's efforts to refinance its loan.

100. The recordation of the Notices of Lis Pendens was in violation of *California Code of Civil Procedure* §§ 405.1 et seq, as well as *California Code of Civil Procedure* §47.

101. DECO would have probably been able to successfully refinance its loan, had the TRUST not recorded the Notices of Lis Pendens.

102. By recording the Lis Pendence, the TRUST intended to disrupt the relationship and/or knew that disruption of the relationship was certain or substantially certain to occur.

103. The recordation of the Lis Pendence by the TRUST did actually disrupt DECO's efforts to refinance its loan, resulting in damages of approximately $500,000 per month to DECO.

104. The TRUST's conduct was a substantial factor in causing DECO's harm.

105. As a direct result of TRUST's conduct, Cross-Complainant has suffered a minimum of $1,500,000 so far, and continue to suffer approximately $500,000 per month, as a result of the false Lis Pendens recorded by the TRUST.

*Prayer for Relief-Eighth Cause of Action*

Wherefore, Cross-Complainants respectfully requests that this Honorable Court award Cross-Complainant judgment in its favor and against Cross-Defendants for a) general and compensatory damages in the amount of $3,000,000, but according to proof at trial; b) Prejudgment interest; 3) Special and consequential damages; 4) Punitive damages; 5) Costs and attorneys' fees incurred in this action; and 6) Any other and further relief the court considers proper.

**NINTH CAUSE OF ACTION**

**INDEMNIFICTION**

**(By DECO against BENJAMIN POULADIAN, and ROES 1-20)**

106. Cross-Complainants incorporate by reference, as though set forth in full herein, paragraphs 1 through 105, inclusive.

107. At all times relevant, POULADIAN was the president and director of DEO.

108. At all times relevant, POULADIAN was the person in charge of the programs known as Buy America Act and/or Buy American Act.

109. At all times relevant, POULADIAN had the duty and obligation to be truthful and perform his obligations faithfully and truthfully.

110. On or about February 2022, DECO received a Civil Demand with respect to DECO's certification of compliance of its products with the Buy America and/or Buy American Act.

111. Deco has incurred costs and fees and in the event that DECO is found

liable for any claims asserted by any person, including the United States government, for violation of Buy America Act or Buy American Act or related claim, as a result of POUADIAN's dishonest actions, then POULADIAN should indemnify DECO in full, because POULADIAN was the substantial factor in causing the harm.

*Prayer for Relief-Ninth Cause of Action*

Wherefore, Cross-Complainants respectfully requests that this Honorable Court award Cross-Complainant judgment in its favor and against Cross-Defendants for a) a judgment declaring that the actions of POULADIAN are the sole cause, or substantial cause, and that POULADIAN is liable to DECO for some or all of any sums for which DECO is adjudged to be liable; b) expenses incurred by DECO; 5) Costs and attorneys' fees incurred in this action; and 6) Any other and further relief the court considers proper.

**<u>TENTH CAUSE OF ACTION</u>**

**DISALLOWANCE OF CLAIM NO. 24**

**(By DECO against BENJAMIN POULADIAN)**

112. Cross-Complainants incorporate by reference, as though set forth in full herein, paragraphs 1 through 111 inclusive.

113. On March 26, 2020, POULADIAN caused to be filed a Proof Of Claim ("Claim No. 24") with the United States Bankruptcy Court for the Central District of California [Los Angeles Division]. By the Proof Of Claim, POULADIAN

asserts a general unsecured claim against DECO in the amount of $325,000 for money loaned.

114. To the extent Claim No. 24 is allowed, it should be offset by the amount of any judgment DECO is awarded against POULADIAN by reason of any one or more of the causes of action set forth above.

*Prayer for Relief - Tenth Cause of Action*

Wherefore, DECO respectfully requests that this Honorable Court award DECO judgment in its favor and against Cross-Defendant POULADIAN disallowing Claim No. 24, in its entirety, pursuant to 11 U.S.C. §502(a), and granting DECO such other and further relief as this Court deems just and proper.

## ELEVEMNTH CAUSE OF ACTION

## DISALLOWANCE OF CLAIM NO. 29

## (By DECO against BENJAMIN POULADIAN)

115. Cross-Complainant incorporate by reference, as though set forth in full herein, paragraphs 1 through 114, inclusive.

116. On March 31, 2020, POULADIAN caused to be filed a Proof Of Claim (“Claim No. 29”) with the United States Bankruptcy Court for the Central District of California [Los Angeles Division]. By the Proof Of Claim, POULADIAN asserts a general unsecured claim against DECO in the amount of $453,504.03 for credit card charges.

117. DECO is informed and believes, and based thereon alleges that the

amount of any credit card charges incurred by POULADIAN on behalf of DECO is less than the amount set forth in Claim No. 29, by at least $8,448.31.

118. DECO is informed and believes, and based thereon alleges that POULADIAN authorized an electronic debit(s) from DECO's bank accounts after his resignation, aggregating no less than $5,060.20.

119. DECO is informed and believes, and based thereon alleges that many of the credit card charges, aggregating no less than $2,227.46, were not incurred on behalf of DECO, but rather were charges incurred for POULADIAN, personally, and should not therefore not be charged to DECO.

120. DECO is informed and believes, and based thereon alleges that Claim No. 29 is duplicative of the following:

(a) the general unsecured claim of Chase in the amount of $71,577.49, set forth in DECO's Amended Bankruptcy Schedules, Schedule F, #3.85 [Docket #149];

(b) the general unsecured claim of Citi business Card in the amount of $3,971.55, set forth in DECO's Amended Bankruptcy Schedules, Schedule F, #3.88 [Docket #149];

(c) Claim No. 30, filed on behalf of American Express National Bank, in the amount of $7,499.43; and

(d) Claim No. 31, filed on behalf of American Express National Bank, in the amount of $317,252.69.

121. To the extent Claim No. 29 is allowed, it should be offset by the amount of any judgment DECO is awarded against POULADIAN by reason of any one or more of the causes of action set forth above.

*Prayer for Relief - Eleventh Cause of Action*

Wherefore, DECO respectfully requests that this Honorable Court award DECO judgment in its favor and against Cross-Defendant POULADIAN disallowing Claim No. 29, in its entirety, pursuant to 11 U.S.C. §502(a), and granting DECO such other and further relief as this Court deems just and proper.

Dated: December 26, 2022 **MOUSAVI & LEE, LLP**

By: *Amy Mousavi*

Amy A. Mousavi, Esq.
Attorneys for Defendant Craig Allen,
Cross-Complainant /Defendant Deco
Enterprises, Inc.

# EXHIBIT 1

**POULADIAN 1997 FAMILY TRUST**

**CERTIFICATE OF TRUST**

**PURSUANT TO CALIFORNIA PROBATE CODE SECTION 18100.5**

The undersigned, DELARA POULADIAN ("DELARA"), BENJAMIN POULADIAN AND DONNA AHDOOT the co-trustees of the Amended and Restated Abraham and DELARA Pouladian 1997 Family Trust, under an agreement dated February 24, 2015 (the "Trust"), and as described below, confirm the following facts:

1. The Amended and Restated Abraham and DELARA Pouladian 1997 Family Trust under an agreement dated February 24, 2015 (the "Trust"), as amended by that certain Amendment #1 to the Trust, currently the Trust, is currently in full force and effect. DELARA has allocated the assets of the Trust to either the Survivor's Trust or the Exemption Trust as sub trusts of the Trust.

2. The settlors of the Trust are ABRAHAM POULADIAN and DELARA POULADIAN.

3. ABRAHAM POULADIAN passed away May 8, 2017. DELARA POULADIAN has named BENJAMIN POULADIAN AND DONNA AHDOOT as co-trustees with DELARA Pouladian.

4. The powers of the co-trustees include:

   A. The power to sell, convey and exchange any real or personal property;
   B. The power to borrow money and encumber the trust properties with a deed of trust or mortgage; and
   C. All other rights, powers and privileges that an absolute owner of the same property would have, subject to the trustee's fiduciary obligations.

5. The Survivor's Trust is revocable and the Exemption Trust is irrevocable. DELARA POULADIAN is identified as having the power to revoke the Survivor's Trust.

6. The Trust and each of the two sub trusts have three co-trustees. Each trustee has the authority to bind the trust property except that either DELARA, as trustee or a co-trustee, or both BENJAMIN POULADIAN AND DONNA AHDOOT, as co-trustees, must sign any conveyance of real property.

7. The trust's tax identification number, if any, is: 826435914.

8. Title to trust assets shall be taken in the following fashion: **DELARA POULADIAN, as Trustee or Co-trustee, or both BENJAMIN POULADIAN AND DONNA AHDOOT, as Co-Trustees of the Amended and Restated Pouladian 1997 Family Trust, dated February 24, 2015, as amended.**

9. This trust is in full force and effect, and has not been modified or amended in any manner which would cause the representations contained in this certification to be incorrect.

10. The certification is being signed by the current acting co-trustees in conformity with the provisions of California Probate Code Section 18100.5

Dated: January 17, 2020

DELARA Pouladian

Donna Ahdoot

Benjamin Pouladian

CERTIFICATE OF ACKNOWLEDGEMENT OF NOTARY PUBLIC

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
)
County of Los Angeles )

On January 17, 2020, before me, Faramarz Rabizadeh, Notary Public (here insert name) a Notary Public, personally appeared DELARA POULADIAN, BENJAMIN POULADIAN and DONNA AHDOOT, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ______________ (Seal)

FARAMARZ RABIZADEH
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 2268692
LOS ANGELES COUNTY
My Comm. Exp. November 29, 2022

# EXHIBIT 2

**SHAREHOLDER AND BUY-SELL AGREEMENT OF
DECO ENTERPRISES, INC.,
A CALIFORNIA CORPORATION**

THIS Shareholder and Buy-Sell Agreement (hereafter "Agreement") effective October ___, 2013, is entered into among Benjamin Pouladian, Saman Sinai, Siamak Sinai, and Babak Sinai (referred to collectively as "Shareholders" and individually as "Shareholder"), and Deco Enterprises, Inc., a California corporation (hereafter "Corporation"), with respect to all shares of the Corporation's capital stock now or hereafter outstanding, for the purpose of protecting the Corporation and the Shareholders, as well as providing continuity for the Corporation's business in the event of the occurrence of certain events discussed in this Agreement.

**AGREEMENT**

**ARTICLE 1
SHARES SUBJECT TO THIS AGREEMENT**

1.01. Business of the Corporation. The business of the Corporation is manufacturing commercial lighting fixtures and/or any other business, and all matters that are lawful as authorized under the laws of the State of California.

1.02. Shareholders. Shareholders of the Corporation are Benjamin Pouladian, Saman Sinai, Siamak Sinai, and Babak Sinai.

1.03. Initial Shares, Consideration, etc. Each of the Shareholders owns the number of shares of common share listed below:

| Name | Shares Owned |
|---|---|
| Benjamin Pouladian | 30% |
| Saman Sinai | 30% |
| Siamak Sinai | 20% |
| Babak Sinai | 20% |

The shares listed above constitute all of the issued and outstanding capital shares of the Corporation. All of the shares listed above and any additional shares of the capital share of the Corporation that may be acquired by the Shareholders in the future shall be subject to this Agreement.

**ARTICLE 2
CERTAIN DISCLOSURES, WAIVERS AND INDEMNIFICATIONS**

2.01. Representations. Each of the Shareholders acknowledges and represents that:

(a) He has full authority to enter into this Agreement and the execution and performance under the terms of this Agreement would neither violate any laws nor constitute a default;

(b) This Agreement was prepared with his knowledge and consent;

(c) He was advised by counsel to consider seeking independent legal counsel to review this Agreement on his behalf;

(d) He had adequate time to seek the advice of independent counsel and to review this Agreement;

(e) He either obtained such advice or knowingly and intentionally chose not to seek such advice;

(f) He fully understands this Agreement and all of its terms and provisions, including, but not limited to, those provisions which significantly restrict his ability to sell, transfer or otherwise dispose of his shares; and

(g) The restrictions imposed upon his shares pursuant to this Agreement are reasonable.

2.02. Title. Each of the Shareholders represents and warrants that he/she is the record and beneficial owner of the shares referred to in Article 1 above and that he has not sold, transferred, pledged or otherwise encumbered any of those shares or his interest in those shares.

2.03. Indemnity. Each Shareholder agrees to indemnify and hold the Corporation and the other Shareholders harmless from and against any and all liabilities, costs or expenses, including reasonable attorneys' fees, resulting from or arising out of any sale, transfer or other disposition of his shares otherwise than in accordance with the terms and provisions of this Agreement.

## ARTICLE 3
## DISTRIBUTIONS

3.01. Determination of Net Income/Net Profit and Loss. The net profits or net losses of the Corporation for each fiscal year will be determined on a cash /accrual basis in accordance with generally accepted principles of accounting. Each Shareholder will share in the profits and losses in proportionate to his percentage of shares of the common stock of the Corporation.

3.02. Regular Distributions of Net Income. Subject to any retained earnings and to the statutory requirements related to corporate distributions, the net income of the Corporation will be distributed as authorized by the Board of Directors to the Shareholders in proportion to the number of shares of the Corporation owned by each Shareholder.

## ARTICLE 4
## LEGEND ON SHARE CERTIFICATES

4.01. Legend on Share Certificates. Each share certificate, whether presently owned or subsequently acquired, shall be subject to the following condition, as if it was printed on each share certificate:

> “The securities evidenced by this certificate may not be sold, transferred, assigned, pledged, hypothecated or otherwise disposed of except in accordance with, and are subject to, transfer upon certain events described in a shareholder/buy-sell agreement, dated October ____, 2013, between the issuer and the registered holder hereof, a copy of which agreement is on file at the principal office of the issuer. Any attempted transfer that would violate these limitations is void."

4.02. Deposit of Shares with Corporation. Concurrently with the execution of this Agreement, each Shareholder shall deposit his share certificates with the Secretary of the Corporation. Despite the endorsement and deposit, each Shareholder shall have the right to vote shares held of record and to receive dividends paid on them until the shares are sold or transferred, as provided in this Agreement.

## ARTICLE 5
## RESTRICTIONS ON TRANSFER

5.01. Restrictions on Transfer. To accomplish the purposes of this Agreement, any transfer, sale, assignment, hypothecation, encumbrance, or alienation of any of the shares of the Corporation, other than according to the terms of this Agreement is void, and transfers no right, title, or interest in or to those shares to the purported transferee, buyer, assignee, pledgee, or encumbrance holder. Each Shareholder shall have the right to vote shares held of record and to receive dividends paid on them until the shares are sold or transferred in accordance with this Agreement.

5.02. Transfers Are Void. A Shareholder may not, at any time, transfer all or any part of his shares to a spouse, ancestors or lineal descendants (whether natural or adopted) or the spouses of any of such persons. A Shareholder may, however, transfer the right to receive the economic interest in the Corporation, such as dividend or commissions, to other persons.

## ARTICLE 6
## RIGHT OF FIRST REFUSAL
## TRANSFER OF SHARES: VOLUNTARY OR OTHERWISE
## AND MANDATORY BUY-SELL PROVISIONS

6.01. No Right to Assign. Other than assignment or transfer to the Shareholder/Shareholders' Trust/Family Trust, this Agreement, or the rights hereunder, may not be assigned without prior written consent of all Shareholders. While this Agreement is in effect, no Shareholder shall have any right to assign, encumber, or dispose of his shares except as provided herein. The existence of the Agreement, however, shall not affect each Shareholder's right to vote his share and receive any dividends thereon until such time as he/she, or his/her personal representative, has received the purchase price for such share, as provided herein.

6.02. Right of First Refusal. The Corporation and Shareholders shall have the Right of First Refusal in any transfer of the shares of the common stock of the Corporation, whether voluntary or involuntary (death, disability, forced buyout, etc.). No Shareholder shall sell, transfer, pledge, encumber, hypothecate, or in any way dispose of any of his/her shares or any right or interest in them without obtaining prior written consent of the Corporation and of all other Shareholders, unless all of the following procedure set forth in this Section 6.02 of this Agreement is complied with as follows:

Shareholder's Duties:

(a) If a Shareholder desires to transfer any portion or all of his shares in the common stock of the Corporation, Shareholder shall first deliver to the Secretary of the

Corporation a written notice of his intention to transfer his shares (hereafter "Offer Notice"). The Offer Notice shall be in accordance with Section 16.02 of this Agreement regarding notices;

(b) The Offer Notice shall be accompanied by an executed counterpart of any document of transfer, which must include the **name and address of the proposed transferee** and specify the **number of shares to be transferred**, the **price per share, and the terms of payment** (hereafter **"Counterpart")**.

<u>Corporation's Duties</u>:

(c) Promptly on receipt of the notice, the Secretary of the Corporation shall forward a copy of the Offer Notice and the executed Counterpart to each member of the Corporation's Board of Directors, and within 15 days thereafter, a meeting of the Board of Directors shall be duly called, noticed, and held to consider the proposed transfer. For **45 days following notice to the Corporation** (45 days from the date the Offer Notice and Counterpart is served on the Secretary of the Corporation), Corporation shall have the option, but not the obligation, to purchase all or any part of the shares at the price and on the terms stated in the Offer Notice and Counterpart, or at a price determined in the same manner as is provided in Article 10 of this Agreement, **whichever price is lower**.

The Corporation's right to exercise the option and to purchase the stock is subject to the restrictions governing a corporation's right to purchase its own stock in *California Corporations Code* sections 500-501 and to any other pertinent governmental restrictions that are now, or may become, effective.

(d) **If the Corporation exercises the option** within the 45-day period, the Secretary of the Corporation **shall give written notice of that fact to the offering Shareholder**. The Corporation shall pay the purchase price in the manner provided in Section 8.02 of this Agreement.

(e) **If the Corporation <u>DOES NOT</u> exercise the option** within the 45-day period, the Secretary of the Corporation shall immediately forward a copy of the Offer Notice and the executed Counterpart to Shareholders (in accordance with Section 16.02 re: Notice) to the remaining Shareholders, who shall have the option, but not the obligation, to purchase any shares not purchased by the Corporation, at the price and on the terms stated in the Offer Notice and Counterpart, or at a price determined in the same manner as is provided in Article 10 of this Agreement, **whichever price is lower**.

<u>Remaining Shareholders' Duties:</u>

(f) Within 20 days after giving the notice, any Shareholder desiring to acquire any part or all of the shares offered shall deliver to the Secretary of the Corporation **a written election to purchase the shares or a specified number of them**. If the

total number of shares specified in the elections exceeds the number of available shares, each Shareholder shall have priority, up to the number of shares specified in his or her notice of election to purchase, to purchase the available shares in the same proportion that the number of the Corporation's shares that he or she holds bears to the total number of the Corporation's shares held by all Shareholders electing to purchase. The shares not purchased on such a priority basis shall be allocated in one or more successive allocations to those Shareholders electing to purchase more than the number of shares to which they have a priority right, up to the number of shares specified in their respective notices, in the proportion that the number of shares held by each of them bears to the number of shares held by all of them.

Corporation's further Duties:

(g) Within 10 days after the mailing of the notice to the Shareholders, the Secretary of the Corporation shall notify each Shareholder of the number of shares as to which his or her election was effective, and the Shareholder shall pay the purchase price in the manner provided in Article 9, and Section 8.02 of this Agreement.

(h) If the Corporation and the remaining Shareholders do not purchase all the shares set forth in the Offer Notice and Counterpart, all the shares may be transferred to the proposed transferee on the terms specified in the notice, at any time within 3 days after expiration of the Shareholders' option. The transferee will hold the shares subject to the provisions of this Agreement. No transfer of the shares shall be made prior to the end of 95 days after service of the Offer Notice and Counterpart by the offering Shareholder upon the Secretary of the Corporation, nor shall any change in the terms of transfer be permitted without a new notice of intention to transfer and compliance with the requirements of this Article 7 of the Agreement.

**Any transfer by any shareholder in violation of this paragraph shall be null and void and of no effect.**

6.03. Voluntary Disassociation. In the event a Shareholder no longer desires to be a Shareholder in the Corporation, the Shareholder must provide the Corporation with the Offer Notice. The Corporation and the remaining Shareholders shall have the option, but not the obligation, to purchase that Shareholder's shares of common stock of the Corporation using the procedures set forth in Section 6.02, at Fair Market Value as set forth in Article 9 of this Agreement, with payment terms as set forth in Section 8.02 of this Agreement. Since the offering Shareholder does not have an intended transferee other than Corporation and the Shareholders, the offering Shareholder does not need to provide the Corporation with a Counterpart.

6.04. Sale of Shares by Majority. In the event that the Majority shareholders want to sell their shares to a prospective Buyer, such sale shall include the sale of the shares of the minority shareholder, on the same terms and price as offered for the shares of Majority Shareholders.

//

## ARTICLE 7
## OBLIGATIONS OF TRANSFEREE

7.01. Obligations of Transferee. Unless this Agreement expressly provides otherwise, each transferee, or any subsequent transferee, of shares in the Corporation, or any interest in such shares, shall hold the shares or interest in the shares subject to all provisions of this Agreement and shall make no further transfers except as provided in this Agreement. Transfer of the shares shall not be entered on the books of the Corporation until an amended copy of this Agreement has been executed by the prospective transferee. Failure or refusal to sign such an amended copy of this Agreement shall not relieve any transferee from any obligations under this Agreement.

## ARTICLE 8
## PURCHASE ON OTHER EVENTS

8.01. Upon Death or Disability of a Shareholder. Upon the death or disability of a Shareholder, that Shareholder's estate/representative shall sell, and the Corporation shall purchase, all of the shares owned by the Shareholder at the time of the death or disability, for the price and upon the terms provided in Article 8 of this Agreement. **The estate or representative of deceased/disabled shareholder would only be entitled to the economic interest in the shares, i.e., cash value of the shares**. Each Shareholder's spouse agrees that, in the event of death or disability, the spouse would only be entitled to receive the cash value of the Shareholder's shares, as determined by Article 9 of this Agreement.

8.02. Upon Divorce. Each Shareholder and/or each Shareholder's spouse agrees that in the event of divorce, that Shareholder's spouse is only entitled to economic interest in the Corporation. This means that the Shareholder's spouse does not have the right to vote, or participate in any affairs of the Corporation. The value of the shares of each Shareholder is determined per Article 9 of this Agreement. Terms of payment of the spouse's interest are set forth in this Article 8, Sections 8.03 and 8.04.

8.03. Payment. The Corporation and other Shareholders shall have the right to pay for the shares as follows: forty percent (40%) of the value of the shares in cash; the balance in equal quarterly installments evidenced by a promissory note, the note payable twelve (12) months from the date of exercise of the option, with interest at the rate of prime plus six (6 %) per annum payable at its maturity. The promissory note shall include and be subject to the provisions of Section 8.05 hereof.

8.04. Payment in the event of Death or Disability or Divorce. In the event of death, disability, or divorce, however, if the Shareholders have purchased insurance, the insurance proceeds shall be used to pay for the purchase of the shares or spouse's interest in a divorce proceeding.

8.05. Promissory Note. Each promissory note given under this Articles 8 shall include and be subject to the following provisions:

(a) Each note shall provide that, if the payments are not received within 10 days of the due date under the note, such non-payment should be a Curable Default. In that event, the note holder shall provide the obligee under the note with a written

notice, giving the obligee 10 days to cure the default. If the Curable Default is not cured within ten (10) days, that shall be deemed as Non-Curable Default. In the event of a Non-Curable Default, at the election of the holder, all notes of the series shall, without further notice, immediately become due and payable;

(b) Each note shall provide that its maker agrees to pay the reasonable expenses of collection in the event of default, including reasonable attorneys' fees;

(c) Each note shall provide for prepayment, in whole or in part, at any time without penalty but only with the consent of the holder. Such right of prepayment shall apply to those notes last due in the series in inverse order; and,

(d) Each note shall be secured in a manner acceptable to all parties at the time the notes are given.

## ARTICLE 9
## VALUATION

9.01. <u>Valuation</u>. In the event of death, disability, divorce, voluntary transfer, or any other event triggering a buyout under this Agreement or under the mandatory provisions of the *California Corporations Code*, the Fair Market Value of the Corporation and the issued shares shall be determined as follows:

The Board of Directors shall select an accredited financial institution which will appraise and determine the Fair Market Value.

## ARTICLE 10
## INSURANCE

10.01. <u>Insurance</u>. The Corporation shall have the option, but not obligation, to purchase insurance on the lives of the Shareholders. This section shall only become operative after a unanimous decision, in writing, to purchase insurance on the lives of the Shareholders:

In the event that the Corporation elects to purchase insurance on lives of the shareholders, the Corporation shall apply for, and be the owner and primary beneficiary of, all life insurance policies subject to this Agreement and shall pay the premiums on all such policies as they fall due. The Corporation may apply policy dividends to the payment of premiums. Proof of premium payments shall be furnished by the Corporation whenever a Shareholder requests such proof. If the Corporation fails to pay a premium within ten (10) days after it falls due, the insured shall have the right to pay such premium and to be reimbursed therefore by the Corporation.

So long as this Agreement remains in effect, it is expressly agreed that the Corporation shall exercise none of the rights or privileges granted to it as owner by the terms of the policies (such as the right to borrow upon, surrender for cash, change the beneficiary, or assign a policy) except with the written consent of all the Shareholders.

//

Any addition of policies or other changes affecting the insurance under this Agreement shall be recorded in Schedule "C" attached hereto, and at all times, the provisions of this Agreement shall extend to all policies recorded in said Schedule "C".

Procedure. The procedure upon the death of a Shareholder shall be as follows:

(a) The Corporation, as beneficiary, shall promptly file claims to collect in cash the death proceeds of all the policies on the deceased Shareholder's life which are subject to this Agreement;

(b) Upon the collection of such proceeds and the qualification of a personal representative for the deceased Shareholder, the Corporation shall pay over to the personal representative an amount equal to the full proceeds collected, in part or in full payment for the deceased Shareholder's shares;

(c) If the death proceeds of all the policies on the deceased Shareholder's life are less than the total purchase price for his interest as provided herein, the Corporation shall either pay the balance forthwith in cash or, in lieu of such cash payment, shall execute and deliver to the personal representative a series of six (6) promissory notes of equal amount (except that the note last falling due may be for a lesser remaining balance), payable to his order. The first note shall be payable four (4) months after its execution date, and the remaining notes shall be payable at quarterly thereafter, with interest at the rate of ten (10%) per annum, the interest on each note shall be payable at its maturity. Each promissory note shall include and be subject to the provisions of Section 9 hereof; and,

(d) The personal representative of the deceased Shareholder shall promptly execute (and shall cause any other party or parties whose signatures may be necessary to transfer a complete title to the deceased Shareholder's shares to execute) and, concurrently with receipt of the full purchase price for the deceased Shareholder's shares (either in cash, or in cash and notes, as provided above), shall deliver all instruments necessary to effectuate the transfer of the deceased Shareholder's shares to the Corporation. Transfer of such shares shall be made free and clear of all taxes, debts, claims or other encumbrances whatsoever, except for that represented by any promissory notes given under Article 10, Paragraph (c) above.

## ARTICLE 11
## SHAREHOLDER WILLS AND REVOCABLE TRUSTS

11.01. Shareholder Wills and Revocable Trusts. Each Shareholder agrees to include in his/her will or revocable trust a direction and authorization to his or her executor or trustee to comply with the provisions of this Agreement and to sell his or her shares in accordance with this Agreement. However, the failure of any Shareholder to do so shall not affect the validity or enforceability of this Agreement.

//

**ARTICLE 12**
**MANAGEMENT AND CONTROL**

12.01. Board of Directors. The Corporation shall have four (4) directors, all of which shall be Shareholders of the Corporation. Each Shareholder named as a director shall remain a director so long as he/she is a Shareholder, and there is no violation of the terms of this Agreement. Any act or decision made by the Directors or the Shareholders may be evidenced in writing, executed by the requisite number of Shareholders as provided in this Agreement, or otherwise, as the Shareholders agree in writing.

During the term of this Agreement, the Directors will, when appropriate:

(a) Meet at least once annually to elect the Board of Directors and officers of the Corporation;

(b) Cause tax returns and reports to be sent to the Shareholders not later than 120 days after the close of the calendar/fiscal year, unless this requirement is expressly waived in the Bylaws of the Corporation;

(c) After filing the Corporation's original Articles of Incorporation, file any informational certificates that may be required by the California Secretary of State;

(d) Cause the Corporation to maintain the books, records, and other documents required by the *California Corporations Code*;

(e) Use best efforts to make sure the business of the Corporation is conducted in accordance with sound business practices;

(f) Within three months from execution of this Agreement, and thereafter at least once a year, meet and determine the salaries of the employees and officers of the Corporation.

12.02. President and Managing Officer. The President of the Corporation will be ___________________, who will be the Corporation's managing officer. The President will control the day-to-day operations of the business and affairs of the Corporation. At each annual meeting, the Shareholders will elect the officers of the Corporation.

12.03. Approval of All Shareholders. Notwithstanding the provisions in Sections 12.01 and 12.02 of this Agreement, the written consent of the all Shareholders holding 75% or more shares in the Corporation is required to approve the following actions:

(a) Mergers or consolidations involving the Corporation;

(b) Amendment or repeal of the Articles of Incorporation of the Corporation;

(c) Issuance of shares of any class or other rights relating to the issuance of shares of the Corporation;

(d) Transfer of all, or substantially all, the assets of the Corporation;

(e) Amendment of this Agreement;

(f) Acceptance of a new shareholder;

(g) Incurring debts or liabilities in the aggregate amount of $50,000 annually; and

(h) Voluntary Dissolution of the Corporation. Voluntary dissolution of the Corporation shall require the written consent of 50% of Shareholders.

12.04. Shareholders' Meetings. The Shareholders shall meet once annually. Although there will be no required Shareholders meetings except as the annual Shareholders meeting for taking any action specified in Sections 12.02 and 12.03, a special meeting may be called at any time by any Shareholder. The meetings can be conducted over the telephone and consents or approvals bearing the Shareholders' signatures may be obtained by facsimile or electronic mail.

## ARTICLE 13
## TERMINATION

13.01. Termination of Agreement. This Agreement shall terminate on:

(a) The written agreement of all parties;

(b) The dissolution, bankruptcy, or insolvency of the Corporation; or

(c) At such time as only one Shareholder remains.

## ARTICLE 14
## ARBITRATION

14.01. Arbitration. Any claim or controversy arising out of or relating to this Agreement, or arising out of or relating to the Corporation, or the rights or obligations of the Shareholders as shareholders, directors, officers, or employees of the Corporation will be determined by binding arbitration before a single arbitrator, at JAMS, AAA, or Judicate West, in Los Angeles County, California, according to their rules in effect at the time. Each party involved in an arbitration proceeding in accordance with this section will pay its own attorneys' fees, costs and expenses. The cost of conducting the arbitration proceeding itself, including the arbitrator's fees, will be borne by each party to it in proportion to the number of shares of the Corporation owned prior to the commencement of the proceeding.

//

//

**ARTICLE 15**
**AMENDMENT**

15.01. Amendment of Agreement. This Agreement may be amended only by written consent of all parties to the Agreement.

**ARTICLE 16**
**MISCELLANEOUS PROVISIONS**

16.01. Necessary Acts. All parties to this Agreement will perform any acts, including executing any documents that may be reasonably necessary to fully carry out the provisions and intent of this Agreement.

16.02. Notices. All notices, demands, requests, or other communications required or permitted by this Agreement shall be in writing and shall be deemed duly served when personally delivered to the party or to an officer or agent of the party, or when deposited in the United States mail, first-class postage prepaid, addressed to the Corporation at [address of Corporation's principal office], or to a Shareholder at the address appearing for him or her on the books and records of the Corporation, or at any other address the party may designate by written notice to the others.

16.03. Remedies. The parties will have all the remedies available to them for breach of this Agreement by law or in equity. The parties further agree that in addition to all other remedies available at law or in equity, the parties will be entitled to specific performance of the obligations of each party to this Agreement and immediate injunctive relief. The parties also agree that, if an action is brought in equity to enforce a party's obligations, no party will argue, as a defense, that there is an adequate remedy at law.

16.04. Attorneys' Fees. In the event of any litigation concerning this Agreement between the parties to this Agreement, or the parties to this Agreement and the estate of any deceased Shareholder, the prevailing party shall be entitled to, in addition to any other relief that may be granted, reasonable attorneys' fees.

16.05. Binding on Successors and Assigns. This Agreement will be binding on the parties to the Agreement and on each of their heirs, executors, administrators, successors, and assigns.

16.06. Severability. If any provision herein is unenforceable or invalid for any reason, the remaining provisions shall be unaffected by such a holding.

16.07. Governing Law. This Agreement shall be construed according to and governed by the laws of the State of California.

16.08. Entire Agreement. This instrument, and the referenced and attached Exhibits herein, constitutes the entire Shareholder Agreement of the Corporation and correctly sets forth the rights, duties, and obligations of each Shareholder and of each Shareholder to the other. Any prior agreements, promises, negotiations, or representations concerning the Agreement's subject matter not expressly set forth in this Agreement are of no force or effect.

16.09. Agreement Available for Inspection. An original copy of this Agreement duly executed by each of the Shareholders shall be delivered to the Secretary of the Corporation and maintained by the Secretary at the principal office of the Corporation, and shall be made available for inspection by any person requesting to see it.

16.10. General Interpretation. The terms of this Agreement have been negotiated by the parties hereto and the language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent. This Agreement shall be construed without regard to any presumption or rule requiring construction (i) against the party causing all or any part of such instrument to be drafted or (ii) in favor of the party receiving a particular benefit under the Agreement. No rule of strict construction will be applied against any party hereto.

16.11. Third Parties: No Interest. Nothing in this Agreement (whether express or implied) is intended to or shall (i) confer any rights or remedies under or by reason of this Agreement on any persons other than the parties hereto and their respective successors and assigns, (ii) relieve or discharge the obligation or liability of any third person to any party hereto, or (iii) give any third person any right of subrogation or action against any party to this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on October ___, 2013, and agree that the effective date shall be October ___, 2013.

Shareholders:

____________________________
Benjamin Pouladian

____________________________
Babak Sinai

____________________________
Siamak Sinai

____________________________
Saman Sinai

DECO ENTERPRISES, INC.

By: ____________________________

Its: President

parties hereto to express their mutual intent. This Agreement shall be construed without regard to any presumption or rule requiring construction (i) against the party causing all or any part of such instrument to be drafted or (ii) in favor of the party receiving a particular benefit under the Agreement. No rule of strict construction will be applied against any party hereto.

16.11. Third Parties: No Interest. Nothing in this Agreement (whether express or implied) is intended to or shall (i) confer any rights or remedies under or by reason of this Agreement on any persons other than the parties hereto and their respective successors and assigns, (ii) relieve or discharge the obligation or liability of any third person to any party hereto, or (iii) give any third person any right of subrogation or action against any party to this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on October ___, 2013, and agree that the effective date shall be October 1, 2013.

Shareholders:

Benjamin Pouladian

Babak Sinai

Siamak Sinai

Saman Sinai

DECO ENTERPRISES, INC.

By: ____________________

Its: President Benjamin Pouladian

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

4343 Von Karman Avenue, Suite 250-J, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled (*specify*): **FOURTH AMENDED CROSS-COMPLAINT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) January 11, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Raymond H. Aver ray@averlaw.com;averlawfirm@gmail.com;ani@averlaw.com;katya@averlaw.com;jesus@averlaw.com
- David W. Meadows david@davidwmeadowslaw.com
- Amy Mousavi amousavi@mousavilee.com, admin@mousavilee.com
- United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov
- John R Yates jyates@yateslitigation.com, jyates@yateslitigation.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On January 11, 2023, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on January 11, 2023, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

*VIA PERSONAL DELIVERY*
Honorable Sheri Bluebond
Bin Outside of Suite 1534
Judge's Copy temporarily suspended by General Order 20-02

*VIA E-Mail*
Thomas Pistone, Esq. tpistone@pistonelawgroup.com
Saman Sinai Sam@getdeco.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 11, 2023 | Helen Chung | /s/ Helen Chung |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |